Alan Gura (SBN 178,221)
Owen Yeates (pro hac vice)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW, Ste. 801
Washington, DC 20036
Phone: 202-301-3300
agura@ifs.org
oyeates@ifs.org

James R. Sutton (SBN 135,930)
Nicholas Sanders (SBN 307,402)
THE SUTTON LAW FIRM
150 Post St. Ste. 405
San Francisco, CA 94108
Phone: 415-732-7700
jsutton@campaignlawyers.com
nsanders@campaignlawyers.com

Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN FRANCISCANS SUPPORTING PROP B, *et al*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DAVID CHIU, *et al.*,<br><br>*Defendants*. | No. 3:22-cv-02785-LB<br><br>**NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing date: TBD<br>Hearing time: TBD<br>Courtroom: TBD<br>Judge: Honorable Laurel Beeler |

TABLE OF CONTENTS

Table of Authorities ................................................................................................ iv

Notice of Motion and Motion .................................................................................. 1

Memorandum of Points and Authorities .................................................................. 1

Introduction ............................................................................................................ 1

Statement of Issues to Be Decided ......................................................................... 3

Statement of Facts .................................................................................................. 3

I.     Plaintiffs ........................................................................................................ 3

II.    San Francisco's disclosure and compelled speech regime ............................ 4

       A.    California's already comprehensive regime .......................................... 4

       B.    San Francisco intensifies the compelled speech requirements .............. 5

             1.    Print communications (e.g., mailers and newspaper ads) ........... 6

             2.    Audio and video communications .............................................. 7

             3.    Penalties and enforcement ......................................................... 8

III.   Impact on Plaintiffs' Speech ......................................................................... 9

Argument ................................................................................................................ 11

I.     Plaintiffs are likely to establish that San Francisco's compelled speech fails First
       Amendment scrutiny. ..................................................................................... 11

       A.    Strict scrutiny applies to San Francisco's content-based, compelled
             messaging .......................................................................................... 12

       B.    San Francisco's compelled messaging about secondary donors does not serve
             a substantial or compelling interest .................................................... 14

       C.    Less restrictive means to achieve the informational interest highlight the
             unconstitutionality of the compelled speech requirements ................... 17

       D.    San Francisco's effective proscription of shorter ads fails any scrutiny ........ 19

       E.    San Francisco's compelled messaging violates Plaintiffs' freedom of
             association .......................................................................................... 23

II.    The challenged provisions irreparably harm Plaintiffs. .................................. 24

Motion for Temporary Restraining Order (No. 3:22-cv-02785)

III.   The balance of equities, and the public interest, favor Plaintiffs. ........................25

Conclusion..............................................................................................................25

Certificate of Notice...............................................................................................26

Certificate of Service .............................................................................................28

TABLE OF AUTHORITIES

**Cases**

*ACLU of Nev. v. Heller,*
    378 F.3d 979 (9th Cir. 2004)....................................................................13, 19

*Am. Bev. Ass'n v. City & Cty. of S.F.,*
    916 F.3d 749 (9th Cir. 2019)..........................................................21, 22, 23

*Ams. for Prosperity Found. v. Bonta,*
    141 S. Ct. 2373 (2021)............................................................................ passim

*Ariz. Dream Act Coal. v. Brewer,*
    855 F.3d 957 (9th Cir. 2017)..............................................................................25

*Barahona-Gomez v. Reno,*
    167 F.3d 1228 (9th Cir. 1999)...............................................................................1

*Buckley v. Valeo,*
    424 U.S. 1 (1976)..................................................................................... passim

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310 (2010)..........................................................12, 13, 14, 22

*CTIA - The Wireless Ass'n v. City of Berkeley,*
    928 F.3d 832 (9th Cir. 2019)..............................................................................24

*Doe v. San Diego Unified Sch. Dist.,*
    19 F.4th 1173, 2021 U.S. App. LEXIS 35760 (9th Cir. 2021) ...................................25

*East Bay Sanctuary Covenant v. Garland,*
    994 F.3d 962 (9th Cir. 2021)..............................................................................11

*Elrod v. Burns,*
    427 U.S. 347 (1976)............................................................................................24

*Eu v. S.F. Cty. Democratic Cent. Comm.,*
    489 U.S. 214 (1989)..............................................................................................2

*Family PAC v. McKenna,*

685 F.3d 800 (9th Cir. 2012)................................................................14

*Fed. Election Comm'n v. Nat'l Right to Work Comm.,*

459 U.S. 197 (1982)..........................................................................23

*Hernandez v. Sessions,*

872 F.3d 976 (9th Cir. 2017)............................................................25

*Hurley v. Irish-American Gay, Lesbian and Bisexual Grp.,*

515 U.S. 557 (1995)..............................................................2, 11, 18

*Indep. Inst. v. Fed. Election Comm'n,*

216 F. Supp. 3d 176 (D.D.C. 2016)................................................15

*Indep. Inst. v. Williams,*

812 F.3d 787 (10th Cir. 2016)..........................................................15

*Lakewood Citizens Watchdog Grp. v. City of Lakewood,*

No. 21-cv-01488-PAB, 2021 U.S. Dist. LEXIS 168731 (D. Colo. Sep. 7, 2021) ..........15

*McCutcheon v. Fed. Election Comm'n,*

572 U.S. 185 (2014)..............................................13, 19, 20, 22

*McIntyre v. Ohio Elections Comm'n,*

514 U.S. 334 (1995)................................................................14, 20

*Monitor Patriot Co. v. Roy,*

401 U.S. 265 (1971)................................................................................2

*ProtectMarriage.com - Yes on 8 v. Bowen,*

752 F.3d 827 (9th Cir. 2014)............................................................17

*Republican Party v. King,*

741 F.3d 1089 (10th Cir. 2013)........................................................14

*Riley v. Nat'l Fed'n of Blind,*

487 U.S. 781 (1988)................................................11, 12, 13, 18

*Rodriguez v. Robbins,*

715 F.3d 1127 (9th Cir. 2013)..........................................................25

*Sampson v. Buescher,*

625 F.3d 1247 (10th Cir. 2010)...................................................................14

*Sanders Cnty. Republican Cent. Comm. v. Bullock,*

    698 F.3d 741 (9th Cir. 2012)...................................................................24

*Short v. Brown,*

    893 F.3d 671 (9th Cir. 2018)...................................................................11

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*

    240 F.3d 832 (9th Cir. 2001)...................................................................11

*Thomas v. Cty. of Riverside Sheriff's Dep't,*

    No. EDCV 10-01846 VAP(DTBx), 2011 U.S. Dist. LEXIS 164992 (C.D. Cal. July 7,

    2011) ..............................................................................................1

*Van Hollen v. Fed. Election Comm'n,*

    811 F.3d 486 (D.C. Cir. 2016).............................................................15, 16

*Winter v. Nat. Res. Def. Council, Inc.,*

    555 U.S. 7 (2008)...............................................................................11

**Statutes**

Cal. Gov't Code § 82013.............................................................................4

Cal. Gov't Code § 82036.............................................................................5

Cal. Gov't Code § 82047.5..........................................................................4

Cal. Gov't Code § 84101(a).........................................................................4

Cal. Gov't Code § 84107.............................................................................5

Cal. Gov't Code § 84200(a).........................................................................4

Cal. Gov't Code § 84200.5..........................................................................4

Cal. Gov't Code § 84200.8..........................................................................4

Cal. Gov't Code § 84202.3..........................................................................4

Cal. Gov't Code § 84203.............................................................................5

Cal. Gov't Code § 84211(a).........................................................................4

Cal. Gov't Code § 84211(c).........................................................................4

1  Cal. Gov't Code § 84211(d) ........................................................................4

2  Cal. Gov't Code § 84211(f) .........................................................................5

3  Cal. Gov't Code § 84223(a) .......................................................................18

4  Cal. Gov't Code § 84501(c)(1) ...................................................................5

5  Cal. Gov't Code § 84502(a) .........................................................................5

6  Cal. Gov't Code § 84502.2 ...........................................................................5

7  Cal. Gov't Code § 84503(a) .........................................................................5

8  Cal. Gov't Code § 84504 ..............................................................................5

9  Cal. Gov't Code § 84504.1 .............................................................5, 20, 21

10  Cal. Gov't Code § 84504.2 ..........................................................................21

11  Cal. Gov't Code § 84504.3 ...........................................................................5

12  Cal. Gov't Code § 84504.6 ...........................................................................5

13  Cal. Gov't Code § 85704 .............................................................................19

14  S.F. Campaign and Governmental Conduct Code § 1.110(a) ................2, 5, 18

15  S.F. Campaign and Governmental Conduct Code § 1.112(a)(1) .................4, 5

16  S.F. Campaign and Governmental Conduct Code § 1.161(a) ...................1, 21

17  S.F. Campaign and Governmental Conduct Code § 1.161(a)(1).................6, 15

18  S.F. Campaign and Governmental Conduct Code § 1.161(a)(2) ....................6

19  S.F. Campaign and Governmental Conduct Code § 1.161(a)(5) ....................7

20  S.F. Campaign and Governmental Conduct Code § 1.168(a) ........................8

21  S.F. Campaign and Governmental Conduct Code § 1.168(b) ........................8

22  S.F. Campaign and Governmental Conduct Code § 1.170.............................8

23  S.F. Campaign and Governmental Conduct Code § 1.170(a) ........................8

24  S.F. Campaign and Governmental Conduct Code § 1.170(b) ........................8

25  S.F. Campaign and Governmental Conduct Code § 1.170(c)........................8

26  S.F. Campaign and Governmental Conduct Code § 1.170(g) ........................8

27  San Francisco Charter, appendix C, § C3.699-13 ....................................8, 9

28  San Francisco Charter, appendix C, § C3.699-13(c)(i)(3) ...........................8

**Other Authorities**

ACLU, *BRCA — Statement of Support from the Ethics & Religious Liberty Commission, Southern Baptist Convention* ................................................. 16

City and Cty. of S.F. Ethics Comm'n, *Independent Expenditure Ads Referring to City Candidates* ............................................................................. passim

**Regulations**

S.F. Ethics Comm'n, *Regulations to Campaign Finance Reform Ordinance San Francisco Campaign and Governmental Conduct Code*, § 1.161-3 .......................... 6, 7

S.F. Ethics Comm'n, *Regulations to Campaign Finance Reform Ordinance San Francisco Campaign and Governmental Conduct Code*, § 1.161-3(a)(4) ..................... 6

NOTICE OF MOTION AND MOTION

To all parties and their counsel of record:

Please take notice that, as soon as the matter may be heard, before the Honorable Laurel Beeler of the United States District Court for the Northern District of California, Plaintiffs will and hereby move the Court under Rule 65 of the Federal Rules of Civil Procedure and Local Rules 7-1 and 6-2, for a temporary restraining order and for a preliminary injunction prohibiting Defendants and their officers, agents, divisions, commissions, and all persons acting under or in concert with them, from enforcing requirements that speakers disclose the top donors to the speakers' top donors on their communications ("on-communication secondary donor disclosure") at S.F. Campaign and Governmental Conduct Code ("S.F. Code") § 1.161(a), https://bit.ly/3MzrSXp.

Plaintiffs request that bond be waived or set in the amount of $1.00. This Court has discretion to waive the security requirements of Fed. R. Civ. P. 65(c) or require only a nominal bond. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999). "Courts [in the Ninth Circuit] also have denied bond requirements where the plaintiff was pursuing litigation that would vindicate important constitutional rights." *Thomas v. Cty. of Riverside Sheriff's Dep't*, No. EDCV 10-01846 VAP(DTBx), 2011 U.S. Dist. LEXIS 164992, at *80 (C.D. Cal. July 7, 2011) (quotation marks omitted) (compiling cases). Given that Plaintiffs seek to vindicate important First Amendment rights, the Court should waive the bond requirement or set bond at a nominal amount.

MEMORANDUM OF POINTS AND AUTHORITIES

INTRODUCTION

The City and County San Francisco ("City" or "San Francisco") coopts speakers' messages about candidates and measures, forcing speakers not just to replace part of their message with the City's speech, but to make the City's message the focus of any message. The City forgets that "the First Amendment 'has its fullest and most urgent application'" in the context of "[f]ree discussion about" political issues like candidacies

and ballot measures. *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)).

To coopt a speaker's message, the City must show that it has a compelling or important interest and that its compelled speech—a requirement that speakers state in their communications the donors to their donors—are narrowly or sufficiently related to that interest. This the City cannot do. It already satisfies the only possible interest—that in informing the public about those who wish to financially support a candidate or measure—by demanding that speakers disclose donor information to the City, which the City then publishes for anyone surfing the web from the comfort of their living room couch to review. S.F. Code § 1.110(a).

But that is not enough for the City. It demands that speakers include their top three donors in any communication and, if any of those donors is a committee, the donor's top two contributors. And internet video advertisements must begin with this information, distracting and driving away listeners before they have even heard the speaker's message. This violates a speaker's right to decide "what to say and what to leave unsaid." *Hurley v. Irish-American Gay, Lesbian and Bisexual Grp.*, 515 U.S. 557, 573 (1995) (quotation marks omitted).

Moreover, the City's compelled messaging cannot inform voters because it in fact misleads them, making them believe that secondary donors who may in fact oppose a message have supported a candidate or measure. Indeed, given that this misleading disclosure may harm secondary donors' reputations, it will keep primary donors like Plaintiff Edwin M. Lee Asian Pacific Democratic Club PAC sponsored by Neighbors for a Better San Francisco Advocacy ("Ed Lee Dems") from supporting messages they would like to share in and from associating with allies like San Franciscans Supporting Prop B ("SPB" or "Committee").

Todd David formed SPB to support the passage of San Francisco Charter Amendment B ("Prop B" or "Proposition B"), but given that the compelled speech requirements frighten away donors, make it impossible to share many of its messages,

1  and too alter the content of others, the Committee will not speak absent injunctive

2  relief against the on-communication secondary donor disclosure requirements at S.F.

3  Code § 1.161(a).

4  STATEMENT OF ISSUES TO BE DECIDED

5  Whether the on-communication secondary donor disclosure requirements at S.F.

6  Code § 1.161(a) are unconstitutional and should be enjoined.

7  STATEMENT OF FACTS

8  I.   PLAINTIFFS

9  Plaintiff SPB is a primarily formed independent expenditure committee, registered

10  with the California Secretary of State and required to file campaign reports with the

11  San Francisco Ethics Commission. David Decl. ¶ 3. Todd David formed the Committee

12  with the goal of supporting Prop B, which would change the duties, composition, and

13  appointment method for the Building Inspection Commission. *Id.* ¶ 4.

14  As the Committee's treasurer, Todd David oversees the Committee's fundraising

15  and expenditures. *Id.* ¶ 2. Mr. David has substantial experience in San Francisco

16  politics, including past management of the San Francisco Parent PAC and other

17  primarily formed committees. *Id.* ¶ 23. But while the City's on-communication

18  secondary donor disclosure demands remain, Mr. David and the Committee will be

19  unable to share their messages with voters, in this or future elections. *Id.* ¶¶ 22, 25.

20  Plaintiff Ed Lee Dems is a grassroots organization dedicated to engaging Asian

21  Pacific Islander ("API") Americans in the Democratic Party, supporting strong API

22  leaders, and empowering young API people in the political process. Cheng Decl. ¶ 3. It

23  also works to benefit the API community and San Franciscans in general by

24  advocating for increased neighborhood safety; affordable housing and health care;

25  supporting local public schools, public transportation, and public parks; and furthering

26  civil rights, women's rights, and LGBT rights. *Id.* ¶ 4. Ed Lee Dems is supporting the

27  Committee's efforts because Prop B's reforms will help fight San Francisco's affordable

28  housing problems. *Id.* ¶ 5.

1   As long as the City's requirements are in place, however, Ed Lee Dems cannot

2   support any efforts by SPB or other committees that would result in on-

3   communication disclosure of its donors. *Id.* ¶¶ 8, 11. Such disclosure will scare away

4   donors to Ed Lee Dems, and it would undermine the organization's mission. For

5   example, disclosure of David Chiu as a secondary donor would imply that he is

6   improperly supporting an issue before the City, damaging the reputation of a

7   prominent member of the API community. *Id.* ¶ 7.

8   II.   SAN FRANCISCO'S DISCLOSURE AND COMPELLED SPEECH REGIME

9   San Francisco expands on the campaign disclosure regime required "by the

10   California Political Reform Act, California Government Code Section 81000 *et seq.*"

11   S.F. Code § 1.112(a)(1). Any statement required by the state must also be filed "in an

12   electronic format with the Ethics Commission." *Id.*

13   A.   California's already comprehensive regime

14   California defines a committee as "any person or combination of persons who

15   directly or indirectly" receives $2,000 or more in contributions or makes $1,000 or

16   more in independent expenditures. Cal. Gov't Code § 82013. A "'Primarily formed

17   committee' means a committee . . . which is formed or exists primarily to support or

18   oppose . . . [a] single candidate [or] . . . single measure." Cal. Gov't Code § 82047.5.

19   A committee must file a "statement of organization . . . with the Secretary of State"

20   and "the local filing officer," here the S.F. Ethics Commission, "within 10 days" of

21   qualifying as a committee. Cal. Gov't Code § 84101(a). Committees are required to file

22   reports at various times. *See* Cal. Gov't Code §§ 84200(a) (semiannual); 84202.3

23   (adding dates on quarters); 84200.5 (preelection); 84200.8 (preelection).

24   Those forced to register as committees must report the total "contributions received

25   during the period covered by the campaign statement and the total cumulative

26   amount of contributions received." *Id.* § 84211(a). They must state the total

27   contributions received by donors contributing $100 or more and then state the total

28   given by those contributing less. *Id.* § 84211(c) and (d). And then the reporting

1   requirements become really specific: If any donor has given aggregate contributions of

2   $100 or more to the committee, and that donor has given any money to the committee

3   during that reporting period, the committee must give the donor's full name, street

4   address, occupation, and employer, as well as the date and amount of the contribution

5   during the period and the total contributions the person has given. *Id*. § 84211(f).

6        Furthermore, California calls any contribution aggregating $1,000 or more that is

7   given within 90 days of an election a "Late contribution," and it requires that

8   committees report such contributions within 24 hours of receiving them, including "the

9   date and amount of the late contribution" and the contributor's full name, "street

10  address, occupation, and the name of the contributor's employer." *Id*. §§ 82036, 84203.

11  Thus, in the months preceding an election, the public has near realtime access to

12  information about a committee's top donors, through both the state and the San

13  Francisco Ethics Commission. S.F. Code §§ 1.110(a), 1.112(a)(1).

14       In addition to disclosing donors to the government, California has strict content

15  and format requirements for communications by ballot measure committees. *See* Cal.

16  Gov't Code §§ 84501-84511. For example, a communication must state, "'Ad paid for

17  by'[,] followed by the name of the committee." *Id*. § 84502(a)(1). The committee's name

18  must include the proposition number or letter, and whether the committee supports or

19  opposes the measure. *Id*. § 84107.

20       After the disclaimer, committees must then add top donor disclosure: each

21  communication must state, "'committee major funding from' followed by the names of

22  the top [three] contributors to the committee," *id*. § 84503(a), who have given

23  "cumulative contributions of" $50,000 or more, *id*. § 84501(c)(1). Strict requirements

24  govern how this information must be communicated. *See id*. §§ 84504 (radio and

25  telephone); 84504.1 (video); 84504.2 (print ads); 84504.3 (electronic media); 84504.6

26  (online platforms).

27       B.  San Francisco intensifies the compelled speech requirements

28       While incorporating all of the state's campaign finance reporting regime, San

Francisco multiplies the compelled speech requirements. Not only must a speaker disclose its own name and the names of its top three donors, but it must disclose on the face of each communication the top two donors of each of their top three donors. S.F. Code § 1.161(a)(1). In addition, San Francisco lowers the threshold for donor reporting, demanding disclosure for donors who have given $5,000 or more, not just those who gave $50,000 or more. *Id.* Except for audio and video communications, the ad must note the amount given by each of these nine donors. *Id.*; S.F. Ethics Comm'n, *Regulations to Campaign Finance Reform Ordinance San Francisco Campaign and Governmental Conduct Code*, § 1.161-3(a)(4) ("S.F. Reg."), https://bit.ly/3KK5WYe.

After listing a committee's three largest donors, a communication must further tell voters that the speaker's financial disclosures, which the speaker has turned over to the City and includes the just-named top donors, may be found at the Commission's website. S.F. Code § 1.161(a)(2); *see* City and Cty. of S.F. Ethics Comm'n, *Independent Expenditure Ads Referring to City Candidates*, https://bit.ly/38l7KcE (emphasis in original) ("IE Reg.") ("**Financial disclosures are available at sfethics.org**" (emphasis in original).

### 1.    *Print communications (e.g., mailers and newspaper ads)*

For print ads designed to be individually distributed, such as mailers and newspaper ads, the text must be at least as big as Arial 14-point font. *Id.* The "Committee major funding" statement and each of the primary contributors must begin a separate line. *Id* (emphasis omitted). The line for each of the primary donors "must be numbered by placing the numerals 1, 2, and 3, respectively, before each" donor's name. S.F. Reg. § 1.161-3, https://bit.ly/3KK5WYe. The words "contributors include" must follow each of the primary donors, that followed by the secondary donors who gave to that primary donor. *Id.* With the disclaimer announcing the speaker's name, the three primary donors, and notice where to find financial disclosures, the disclosure requirement must take up at least 5 lines.

In practice, for communications like those SPB wishes to run, the City's

1    requirements will capture much if not most of a speaker's message. Given the

2    Committee's donors, the disclaimer required here will consume 100% of a two by four

3    inch newspaper "ear" ad, about 70% of a five by five inch ad, about 35% of a five by ten

4    inch ad, and about 23% of an 8.5 by 11 inch mailer. *See* David Decl., ¶¶ 16-18; Exs. 2-

5    5.

                            2.    *Audio and video communications*

7       San Francisco requires that the disclaimer and on-communication disclosure be the

8    focus of an audio or video communication—the first thing the audience sees and hears.

9    S.F. Code § 1.161(a)(5). Such communications must begin stating "**Ad paid for by**

10   **[committee's name]**." IE Reg. (emphasis in original). The on-communication

11   disclosure follows: "**Committee major funding from [name(s) and dollar amount**

12   **contributed of top three (3) donors of $5,000 or more],**" with each of those

13   primary contributors followed by their "**top two (2) contributors of $5,000 or**

14   **more**." *Id.* Audio and video communications must then state, "**Financial disclosures**

15   **are available at sfethics.org**." *Id.*

16      The City also requires that video communications carry a written banner with the

17   disclosure. The written statement is similar to that for print ads. The "Committee

18   major funding" statement and each of the primary contributors must begin a separate

19   line. *Id.* The line for each of the primary donors "must be numbered by placing the

20   numerals 1, 2, and 3, respectively, before each" donor's name. S.F. Reg. § 1.161-3. The

21   words "contributors include" must follow each of the primary donors, that followed by

22   the secondary donors who gave to that primary donor. *Id.* With the disclaimer

23   announcing the speaker's name, the three primary donors, and notice where to find

24   financial disclosures, the disclosure requirement must take up at least 5 lines.

25      This banner must last for at least 17% of the time that shorter ads run, and up to

26   33% of the time longer ads run. IE Reg. ("at least five (5) seconds of a broadcast of 30

27   seconds or less or for at least 10 seconds of a broadcast longer than 30 seconds"). It

28   requires that "[e]ach top contributor . . . be disclosed on a separate horizontal line,"

1    and the entire compelled message with top donor information must take up "one third

2    of the display screen" that the audience sees. *Id.*

3        In practice, the burden on a speaker is much greater. It takes 32-33 seconds to

4    speak the City's compelled message. David Decl. ¶¶ 12-13. This consumes 100% of a

5    15-second ad, 100% of a 30-second ad, and 53-55% of a 60-second ad. *Id.* ¶ 14. The

6    shorter length ads are the most preferred and effective, Derse Decl. ¶¶ 10-11, Sinn

7    Decl. ¶¶ 8-9, yet the City's compelled speech denies the Committee the ability to use

8    either 15- or 30-second ads. Sinn Decl. ¶ 10; David Decl. ¶ 14.

9                         *3.     Penalties and enforcement*

10       The City punishes violations of the on-communication donor disclosure

11   requirement with criminal, civil and administrative penalties. S.F. Code § 1.170.

12   Knowing or willful violations are misdemeanors, punishable by fines up to $5,000 for

13   each violation, up to six months in county jail, or both. *Id.* at § 1.170(a). Failure to

14   report contributions or expenditures is punishable by the greater of $5,000 or three

15   times the amount not reported. *Id.* Intentional or negligent violations are punished

16   with civil fines up to $5,000 for each violation or three times the amount not reported.

17   *Id.* at § 1.170(b). Any other violations are punished administratively, with the same

18   potential fines. *Id.* at § 1.170(c); San Francisco Charter, appendix C, § C3.699-

19   13(c)(i)(3), https://bit.ly/3KP3SOI. If a committee does not comply with the on-

20   communication donor disclosure requirement, its "treasurer[] . . . may be held

21   personally liable for violations." S.F. Code § 1.170(g).

22       Any individual "may file a complaint with the Ethics Commission, City Attorney, or

23   District Attorney," who are required to investigate the complaint. S.F. Code § 1.168(a).

24   Upon belief that a violation has occurred, the Commission must forward any

25   complaint it receives to the district attorney and City attorney. San Francisco Charter,

26   appendix C, § C3.699-13. "The City Attorney . . . may bring a civil action to enjoin

27   violations of or compel compliance . . . ." *Id.* at § 1.168(b). If the City attorney and

28   district attorney do not take action, the Commission may conduct its own investigation

1  and initiate an enforcement hearing. San Francisco Charter, appendix C, § C3.699-13.

2  III.     IMPACT ON PLAINTIFFS' SPEECH

3      The Committee is a primarily formed independent expenditure committee formed

4  to support the passage of Prop B. David Decl. ¶¶ 3-4. Plaintiff Todd David is the

5  treasurer of the Committee and oversees its fundraising and expenditures. *Id*. ¶ 2. The

6  Committee wishes to support the measure with 8.5 by 11 inch mailers; 2 by 2 inch ear

7  ads, 5 by 5 inch ads, and 5 by 10 inch ads in newspapers; and internet ads of varying

8  lengths, including 15-, 30-, and 60-second ads. *Id*. ¶ 5. All these ads will trigger San

9  Francisco's on-communication disclosure requirements.

10     To date, the Committee has raised $15,000, including $5,000 each from Concerned

11  Parents Supporting the Recall of Collins, Lopez and Moliga ("Concerned Parents");

12  BOMA SF Ballot Issues PAC; and Edwin M. Lee Asian Pacific Democratic Club PAC

13  sponsored by Neighbors for a Better San Francisco Advocacy ("Ed Lee Dems"). *Id*. ¶ 6.

14  The Committee hopes to raise further funds, including additional $5,000+

15  contributions. *Id*. ¶ 8. Potential contributors have expressed concern about the

16  secondary donor disclosure requirements and are reluctant to contribute if their

17  donors must be disclosed on the Committee's communications. *Id*. ¶ 20.

18     Two of the Committee's major contributors, Concerned Parents and Ed Lee Dems

19  are themselves committees that have received $5,000 or more from donors, triggering

20  the secondary donor on-communication disclosure requirement. David Decl. ¶ 7.

21     Plaintiff Ed Lee Dems works to empower young Asian Pacific Islander ("API")

22  people in the political process and to support strong API leaders. Cheng Decl. ¶ 3. It

23  also sustains the API community by advocating for better neighborhood safety, public

24  parks, public transportation, and public schools; for affordable housing and health

25  care; and for civil rights, women's rights, and LGBT rights. *Id*. ¶ 4. Ed Lee Dems

26  believes that Prop B will benefit the community by bringing needed reform to the

27  Building Inspection Commission, and that contributing to SPB would help get that

28  message out. *Id*. ¶ 5.

1    Ed Lee Dems cannot support the Committee, however, if the Committee makes any
2    communications that would trigger the on-communication secondary donor disclosure.
3    *Id.* ¶ 11. Doing so could harm the reputations of leaders that it wants to uphold as
4    part of its mission, including City Attorney David Chiu, and it would lose the support
5    of donors if they knew it was supporting groups that triggered the on-communication
6    secondary donor disclosure. *Id.* ¶ 9.

7    Furthermore, the City's compelled speech requirements will make the Committee's
8    messages impossible or ineffective. Taken together, the requirements will take 32-33
9    seconds to state, thus consuming 100% of the Committee's 15-second and 30-second
10   internet video ads and 53-55% of the 60-second ads. David Decl. ¶¶ 13-14. They will
11   take up at least 33% of the screen during the first 5 seconds of the 15-second video ads
12   and the first 10 seconds of the longer ads. IE Reg.[1] For the Committee's newspaper
13   ads, the disclaimer would consume 100% of the two by four inch ads, 70% of the five by
14   five inch ads, and 35% of the five by ten inch ads. David Decl. ¶¶ 16-17. And they
15   would consume 23% of the face of an 8.5 by 11 inch mailer. *Id.* ¶ 18.

16   The Committee and Mr. David would like to share its messages in support of Prop
17   B, without the on-communication secondary donor disclosure the City demands, but it
18   refrains from doing so because it fears the penalties for exercising its First
19   Amendment rights. Accordingly, they will refrain from speaking absent a restraining
20   order and further injunctive relief. David Decl. ¶¶ 25-26.

21   Furthermore, Mr. David has long been active in San Francisco politics, creating
22   primarily formed and other committees to advocate about measures and candidates,
23   including the San Francisco Parent PAC and Yes on Prop B, Committee in Support of
24   the Earthquake Safety and Emergency Response Bond. David Decl. ¶¶ 23-24. Mr.
25   David will create primarily formed committees in future elections, but San Francisco's

---

[1] Under state law, such disclaimers use up 33% of the screen. If San Francisco's 4% line height rule were used, the Committee's disclaimer would use up approximately 51% of the screen. David Decl. ¶ 15.

1   requirements will continue to limit the messages that Mr. David and his committees

2   will be able to share. David Decl. ¶ 25. The law will also continue to inhibit others

3   from associating with and supporting the messages of Mr. David and his committees.

4   David Decl. ¶ 8; Cheng Decl. ¶¶ 8-9, 11. Ed Lee Dems, in particular, will be unable to

5   support Mr. David's or other committees as long as San Francisco requires on-

6   communication secondary donor disclosure. Cheng Decl. ¶¶ 8-9, 11.

7                                         ARGUMENT

8       The Court should grant Plaintiffs' request for a temporary restraining order and a

9   preliminary injunction because (1) they "are likely to succeed on the merits;" (2) they

10  will "suffer irreparable harm in the absence of preliminary relief; (3) the balance of

11  equities tips in their favor; and (4) an injunction is in the public interest." *Short v.*

12  *Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (citing *Winter v. Nat. Res. Def. Council, Inc.*,

13  555 U.S. 7, 20 (2008)). "When the government is a party, these last two factors merge."

14  *East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 975 (9th Cir. 2021) (citations

15  omitted). The Court's "analysis is substantially identical for the [preliminary]

16  injunction and the TRO." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d

17  832, 839 n.7 (9th Cir. 2001).

18  I.   PLAINTIFFS ARE LIKELY TO ESTABLISH THAT SAN FRANCISCO'S COMPELLED SPEECH

19       FAILS FIRST AMENDMENT SCRUTINY.

20      San Francisco's demand for secondary on-communication disclosure is a form of

21  compelled speech that cannot survive First Amendment scrutiny. It goes beyond any

22  disclaimer or disclosure that the Supreme Court has ever approved, and it is not

23  tailored to any interest that might justify a speaker's right to decide "what to say and

24  what to leave unsaid." *Hurley*, 515 U.S. at 573 (quotation marks omitted); *see also*

25  *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 797 (1988) (holding that "freedom of

26  speech" is "a term necessarily comprising the decision of both what to say and what

27  *not* to say" (emphasis in original)). "Mandating speech that a speaker would not

28  otherwise make," as the Code does here, "necessarily alters the content of the speech."

*Riley*, 487 U.S. at 795. In such situations, "the First Amendment direct[s] that government not dictate the content of speech absent compelling necessity, and then, only by means precisely tailored." *Id.* at 800. While strict scrutiny should apply here to this content-altering compelled speech, San Francisco's on-communication disclosure requirements cannot withstand the tailoring required under either strict or exacting scrutiny.

A.  Strict scrutiny applies to San Francisco's content-based, compelled messaging

Although the Supreme Court has applied exacting scrutiny to true disclaimer and disclosure requirements, strict scrutiny must apply to the hybrid that San Francisco has created. The Supreme Court recently signaled that it may be increasing the scrutiny given to any disclosure regime. *Compare Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) ("*AFPF*") (Roberts, C.J., op.) (exacting scrutiny applies to disclosure requirement), *with id.* at 2390 (Thomas, J., concurring) (strict scrutiny applies to all disclosure requirements), *with id.* at 2391 (Alito, J., concurring) (withholding judgment whether strict or exacting scrutiny applies).

But even prior to *AFPF*, strict scrutiny and not exacting scrutiny was required for the hybrid of disclosure and disclaimers at issue here. Disclaimers and disclosure are terms of art, and their proper demarcation is critical to constitutionally applying them. In the jargon of campaign regulation, disclaimer statutes require that a communication state who made it—who "is responsible for the content of th[e] advertising," *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366 (2010), while disclosure statutes require that speakers report *to the government* their expenditures and contributions, *Buckley v. Valeo*, 424 U.S. 1, 63 (1976) (per curiam). So defined, disclosure and disclaimer requirements "impose no ceiling on campaign-related activities." *Citizens United*, 558 U.S. at 366. That is, a true disclaimer is short, little more than a two-or three-second statement about who made the ad. And disclosure is information that the speaker gives to the government, that it may then make available using its own resources to the public. Given that true disclosure has no effect on a

1    message's length, and a true disclaimer is so short, neither acts to "impose [a] ceiling

2    on campaign-related activities," *id.*, or to "reduce[] the quantity of expression,"

3    *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 197 (2014). Given that San

4    Francisco's hybrid of disclaimer and disclosure requirements does reduce the quantity

5    of discussion, the City must meet strict scrutiny' demands for a "compelling interest

6    and . . . least restrictive means." *McCutcheon*, 572 U.S. at 197.

7         Moreover, strict scrutiny further applies as San Francisco has devised a content-

8    based restriction on speech, as compelling a speaker to share the government's

9    message "necessarily alters the content of the speech." *Riley*, 487 U.S. at 795; *see id.* at

10    800 (requiring "precisely tailored" to a "compelling necessity"). Accordingly, the Ninth

11    Circuit has already required strict scrutiny for similar on-communication disclosure

12    requirements, and held that the law was unconstitutional. *ACLU of Nev. v. Heller*, 378

13    F.3d 979, 992 (9th Cir. 2004) (discussing "most 'exacting scrutiny'").

14         Under strict scrutiny, San Francisco's compelled speech requirements must

15    "promote[] a compelling interest and [be] the least restrictive means to further [that]

16    interest." *McCutcheon*, 572 U.S. at 197. But even under exacting scrutiny, the

17    government must establish "a substantial relation between the disclosure requirement

18    and a sufficiently important governmental interest." *AFPF*, 141 S. Ct. at 2383

19    (Roberts, C.J., opinion) (quotation marks omitted). And San Francisco's law cannot

20    escape the doubts raised if less restrictive means exist under either of these standards.

21    *Id.* at 2386 (majority op.) (requiring that the government "demonstrate its need for"

22    more burdensome requirements "in light of any less intrusive alternatives"); *cf.*

23    *McCutcheon*, 572 U.S. at 218 ("In the First Amendment context, fit matters[, e]ven

24    when the Court is not applying strict scrutiny . . . .").

25         San Francisco's secondary on-communication disclosure requirements are not

26    substantially related to the only applicable governmental interest, much less narrowly

27    tailored to a compelling interest. And the requirements utterly fail any inquiry, under

28    strict or exacting scrutiny, into whether less restrictive alternatives are available.

B.  San Francisco's compelled messaging about secondary donors does not serve a
     substantial or compelling interest

The Supreme Court has recognized only three interests as substantial enough to save disclosure laws under exacting scrutiny: fighting actual or apparent corruption, combatting circumvention of contribution limits, and the informational interest. *Buckley*, 424 U.S. at 66-68. None of these could support San Francisco's law.

The anticircumvention interest exists only as a corollary to the anticorruption interest, and the anticorruption interest cannot exist in the context of independent expenditures, which by definition cannot pose the risk of dollars being exchanged for political favors. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 352 n.15 (1995) (noting that "[t]he risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue" (citations and quotation marks omitted)); *Citizens United*, 558 U.S. at 357 (holding that the anticorruption interest does not apply to expenditures made independent of candidates); *Republican Party v. King*, 741 F.3d 1089, 1102 (10th Cir. 2013) (rejecting any "freestanding" anti-circumvention interest where the anti-corruption interest does not exist).

Moreover, the government has no interest in informing the public about whatever might strike it or the government's fancy. Disclosure laws justified under the government's informational interest must inform voters "concerning those who support" a ballot measure or candidate before the voters, *Buckley*, 424 U.S. at 81, not in doxing supporters of a speaker or organization generally. Thus courts must analyze whether there exists in a given case a "public interest in knowing who is spending and receiving money to support or oppose a ballot issue." *Sampson v. Buescher*, 625 F.3d 1247, 1256 (10th Cir. 2010); *see also Buckley*, 424 U.S. at 66 (noting interest in "where political campaign money comes from" (quotation marks omitted)); *Family PAC v. McKenna*, 685 F.3d 800, 806 (9th Cir. 2012) ("an interest in learning who supports and opposes ballot measures"). And, to ensure that disclosure requirements actually get at monetary support for a candidate or ballot measure, courts have emphasized the

1   importance of limiting disclosure to contributions earmarked to support such

2   advocacy. *See Van Hollen v. Fed. Election Comm'n*, 811 F.3d 486, 497 (D.C. Cir. 2016)

3   (using cancer society example to explain earmarking); *Indep. Inst. v. Williams*, 812

4   F.3d 787, 797 (10th Cir. 2016) (noting importance of earmarking); *Lakewood Citizens*

5   *Watchdog Grp. v. City of Lakewood*, No. 21-cv-01488-PAB, 2021 U.S. Dist. LEXIS

6   168731, at *33-36 (D. Colo. Sep. 7, 2021) (same); *Indep. Inst. v. Fed. Election Comm'n*,

7   216 F. Supp. 3d 176, 191 (D.D.C. 2016) (three judge panel) (noting that requirements

8   tailored to donors giving "for the specific purpose of supporting the advertisement").

9        The challenged provisions do not serve the informational interest. Section 1.161

10  forces the Committee to include a long statement about the top two donors to each of

11  its top three donors. S.F. Code § 1.161(a)(1) (defining top donors as those giving $5,000

12  or more). But San Francisco does not require that the secondary donors contribute to

13  the primary donors with the goal of supporting the Committee's communications in

14  favor of Prop B. It does not even require that the secondary donors have knowledge,

15  much less a suspicion, that their donations might eventually support Prop B.

16       Indeed, those secondary donors may be giving to the Committee's donors for any

17  number of reasons. For example, some donors may intend to support the efforts of Ed

18  Lee Dems to promote the representation of Asian-Pacific Islanders in San Francisco

19  politics and leadership; to further civil rights, women's rights, and LGBT rights; to

20  support public schools, public transportation, and local parks; and to secure access to

21  affordable housing and health care. *See* Cheng Decl. ¶¶ 3-4. When they give the

22  organization $5, $50, or $5,000, they may have no clue that Ed Lee Dems cares

23  anything about Prop B, much less that their donations might help support Ed Lee

24  Dems's donation to another committee that supports Prop B. Indeed, some Ed Lee

25  Dems donors might oppose Prop B.

26       For example, when David Chiu for Assembly 2022 donated to Ed Lee Dems, it is

27  highly unlikely that Mr. Chiu knew that Ed Lee Dems would be donating to SPB, or

28  that his committee might be listed as a donor on one of SPB's communications. Cheng

Decl. ¶ 7. Nonetheless, in the name of informing San Francisco's voters, the disclaimer San Francisco requires would lead voters to believe that Mr. Chiu is running for another office and improperly taking positions on City issues. *Id*.

The D.C. Circuit further illustrated the point in *Van Hollen v. Fed. Election Comm'n*, 811 F.3d 486 (D.C. Cir. 2016). Upholding an FEC regulation's earmarking requirement, the court noted "the intuitive logic" that an expansive donor disclosure regime would spread misinformation. *Id*. at 497-98. The court contemplated a "not unlikely scenario" where a partisan Republican gave to the American Cancer Society's general mission "to fund the ongoing search for a cure," yet found herself reported as supporting Cancer Society ads that attacked "Republicans in Congress" whose deficit-reducing efforts would mean "fewer federal grants for scientists studying cancer." *Id*. at 497. "Wouldn't a rule requiring disclosure of [the] Republican donor, who did *not* support issue ads against her own party, convey some misinformation to the public about who *supported* the advertisements?" *Id*. (emphasis in original).[2]

The level of confusion is inevitable when secondary donors are included directly on the face of an ad, with similar billing to the primary speaker and its actual financial supporters. It is only natural to assume that individuals listed on the face of a communication support it. By forcing the Committee to include secondary donors on its communications, San Francisco misleads the public, making voters believe that the secondary donors support Prop B and the Committee's communications in support of Prop B, even though they may in fact oppose both. This not only fails to serve the informational interest, but subverts it. It undermines voters' efforts "to place [the ballot measure] in the political spectrum," *Buckley*, 424 U.S. at 67, to understand

---

[2] Likewise, if the Southern Baptist Convention were to donate to the ACLU for its efforts in fighting the patentability of human genetic material, it would be an exaggeration to conclude that it supported an ad run by the ACLU in favor of legal abortion. *See* ACLU, *BRCA — Statement of Support from the Ethics & Religious Liberty Commission, Southern Baptist Convention*, https://bit.ly/3xEs8QP (noting ideological alliance on issues).

16

Motion for Temporary Restraining Order (No. 3:22-cv-02785)

1  which groups and individuals in the political spectrum support and do not support the

2  measure. *See also id.* at 81 (noting that the interest must "help[] voters to define more

3  of the [measure's] constituencies"); *ProtectMarriage.com - Yes on 8 v. Bowen*, 752 F.3d

4  827, 832 (9th Cir. 2014) ("where a particular ballot measure or candidate falls on the

5  political spectrum").

6      San Francisco's on-communication secondary donor disclosure falls far short of

7  exacting scrutiny's requirement that it be substantially related to the informational

8  interest. Accordingly, there is even less chance that it could survive strict scrutiny's

9  requirement that it be narrowly tailored, even if San Francisco somehow

10  demonstrated that it had a compelling interest. The requirements are

11  unconstitutional, both facially and as applied to the Committee's speech.

12      C.  Less restrictive means to achieve the informational interest highlight the

13          unconstitutionality of the compelled speech requirements

14      Even if San Francisco could demonstrate a substantial relation to the

15  informational interest, "a substantial relation to an important interest is not enough

16  to save a disclosure regime that is insufficiently tailored." *AFPF*, 141 S. Ct. at 2384.

17  Narrow tailoring is demanded "where First Amendment activity is chilled—even if

18  indirectly—[b]ecause First Amendment freedoms need breathing space to survive." *Id*.

19  (quotation marks omitted) (alteration in original). San Francisco's requirements

20  directly chill the Committee's and others' speech, and the City must therefore

21  "demonstrate its need for universal production in light of any less intrusive

22  alternatives." *Id*. at 2386. It cannot do so.

23      The internet did not exist when *Buckley* upheld the Federal Election Campaign

24  Act's disclosure provisions. We no longer live in 1976, when accessing the disclosure

25  information required obtaining documents from Washington, D.C. and compiling

26  information from paper records, and yet *Buckley* gave no hint of a need for on-

27  communication disclosure. Inquisitive San Francisco voters need only visit the Ethics

28  Commission's offices near City Hall, where all the "[c]ampaign statements are to be

1   open for public inspection and reproduction." S.F. Code § 1.110(a). In fact, they do not

2   need to even leave their home or campaign office to discover their ideological

3   opponents' doings, as the Commission is required to "make campaign statements

4   available through its website." *Id*. And, if a list of a speaker's top contributors and its

5   contributors' contributors were really necessary to serve an informational interest,

6   then San Francisco might try to follow the state's example and require that speakers

7   "maintain an accurate list of the committee's top . . . contributors," and provide that to

8   the Ethics Commission. Cal. Gov't Code § 84223(a). The Commission could then make

9   it publicly "available through its website." S.F. Code § 1.110(a); *see Riley*, 487 U.S. at

10  800 (noting that the government could "itself publish [any] financial disclosure forms

11  it requires," thus "communicat[ing] the desired information to the public without

12  burdening a speaker with unwanted speech").

13      Moreover, San Francisco cannot argue that the compelled speech is constitutional

14  because it only results in more speech. Given speakers' limited resources, San

15  Francisco's compelled speech requirements force speakers to decide what part of their

16  message they will lose to make room for the City's message. The City's compelled

17  message for the Committee will use up 100% of a 15-second internet video ad, 100% of

18  a 30-second ad, and 53-55% of a 60-second ad, as well as a third to half the screen at

19  the beginning of each ad for the written requirements, David Decl. ¶¶ 14-15; 100% of a

20  two by four inch newspaper ad, about 70% of a five by five ad, and about 35% of a five

21  by ten inch ad, *id*. ¶¶ 16-17; and about 23% of the face of an 8.5 by 11 inch mailer, *id*.

22  ¶ 18. That is, for many ads, San Francisco forces individuals and groups to give up

23  speaking altogether. And with respect to all ads, it violates a speaker's right to decide

24  "what to say and what to leave unsaid." *Hurley*, 515 U.S. at 573 (quotation marks

25  omitted). "No governmental interest that has been suggested is sufficient to justify the

26  restriction on the quantity of political expression . . . ." *Buckley*, 424 U.S. at 55.

27      Nor can San Francisco argue that such on-communication secondary donor

28  disclosure to reveal contributions that are hidden when funneled through multiple

1  committees. California law already requires that if a contributor gives a contribution

2  to a committee, but that money is earmarked as a contribution to another committee

3  or to support a ballot measure or candidate, then the money must be reported by all

4  parties as a contribution for that final committee, ballot measure, or candidate. Cal.

5  Gov't Code § 85704.

6     San Francisco might assert that the on-communication secondary disclosure is

7  nonetheless necessary because it is easier for voters to get the disclosure from the

8  speaker's communication than from the Commission's website. But mere

9  "convenience" is too weak an interest to justify an infringement on core First

10  Amendment rights. *AFPF*, 141 S. Ct. at 2387 (noting that "[m]ere administrative

11  convenience does not remotely 'reflect the seriousness of the actual burden," and "the

12  weakness of the [government's] interest in administrative convenience").

13     "The availability of the less speech-restrictive reporting and disclosure requirement

14  confirms that a statute like the one here at issue cannot survive the applicable narrow

15  tailoring standard." *Heller*, 378 F.3d at 995. Whether under strict scrutiny, as in

16  *Heller*, or under exacting scrutiny, San Francisco's on-communication secondary donor

17  disclosure fails tailoring and is facially unconstitutional.

18     D.  San Francisco's effective proscription of shorter ads fails any scrutiny

19     Owing to the length of its demanded messages, the City has crossed the line from

20  merely requiring disclaimers and disclosure to limiting how much a committee can

21  speak, indeed to proscribing many messages. Because San Francisco in fact "reduce[s]

22  the quantity of expression," its requirements must "promote[] a compelling interest

23  and [be] the least restrictive means to further" it. *McCutcheon*, 572 U.S. at 197.

24  Furthermore, the City may not rely on the informational interest to sustain its speech

25  limits. The Supreme "Court has identified only one legitimate governmental interest

26  for restricting campaign finances," or the speech those finances make possible:

27  "preventing corruption or the appearance of corruption." *Id*. at 206. Put more strongly,

28  the Supreme Court has "consistently rejected attempts to suppress campaign speech

1  based on other legislative objectives." *Id.* at 207.

2      Given that this case involves ballot measures and not candidate elections, there

3  can be no actual or apparent risk of quid pro quo corruption. *See id.* at 208 (noting

4  interest "confined to . . . *quid pro quo* corruption); *McIntyre*, 514 U.S at 352 n.15

5  (noting no corruption risk for ballot measures). Thus, San Francisco lacks any

6  legitimate interest in limiting Plaintiffs' speech or association, and it certainly cannot

7  demonstrate that its restrictions are properly tailored to a nonexistent interest.

8      Moreover, the City cannot deny that its compelled messaging effectively proscribes

9  shorter messages. Online video advertising is one of the preferred advertising methods

10 for "ballot measure campaigns, especially for small" ones. Sinn Dec. ¶ 5. And shorter

11 video ads, those lasting 15 seconds or less, are becoming the preferred length for such

12 ads. Derse Decl. ¶ 11. But San Francisco's demanded disclaimer and disclosure takes

13 32-33 seconds to share, David Decl. ¶ 13, ruling out the use of the shorter, preferred

14 15-second ads. Indeed, speakers cannot use even 30 second ads, as the City's

15 demanded message would still require more time than the message.

16     And even if a speaker could afford a 60-second ad, it would be useless to getting out

17 the speaker's chosen message. To be effective, an ad must get a viewer's attention

18 within the first three to five seconds. Derse Decl. ¶ 12; Sinn Decl. ¶ 6. After that time,

19 a viewer will change the channel, scroll down the page, or otherwise avoid the ad.

20 Derse Decl. ¶¶ 12-15; Sinn Decl. ¶¶ 11-18. It is difficult to see how San Francisco's

21 disclaimer and disclosure requirements could even be considered remotely engaging.

22 *See* Sinn Decl. ¶16. They all follow the same format: announcing a speaker's name, a

23 statement that funding information will follow, up to nine donors, and a statement

24 that the donor and other financial information may be found at the Ethics

25 Commission's website. This is not must-see TV.

26     Besides the spoken disclaimer swallowing at least half of the ad's dialogue, a

27 written disclaimer must take up one third of the screen for at least the first 10

28 seconds. IE Reg.; Cal. Gov't Code § 84504.1(b). But the black box dominating the

message could end up consuming more than one-third of the screen for ads that have multiple primary and secondary donors, since each primary donor must be set on its own line from any other text, and each line must take up at least 4% of the screen. *Id*. The disclaimer would take up at least one third of the screen. IE Reg.; David Decl. ¶ 15. San Francisco's requirements result in internet video ads that are "unlikely to capture a user's attention," such that speakers are at best "paying for [viewers to see and hear the City's] statement and not for the campaign's message." Sinn Decl. ¶ 19.

The City's requirements similarly consume or dominate the Committee's newspaper ads. As with the video ads, the requirements for newspaper ads require a line or two stating that the Committee made the ad and announcing that donor information will follow, then one to three lines for each of the primary donors and their donors, and then a line directing readers to the Ethics Commission's website for that and other donor information. IE Reg.; S.F. Code § 1.161(a)(1)-(3); Cal. Gov't Code § 84504.2. The Committee's 2 by 4 inch ads are entirely consumed by the City's message before that message is even complete. David Decl. ¶ 16; Ex. 2. While the Committee's five by five inch ads contains enough room to finish the City's compelled message, doing so leaves little room for anything else. The City's message takes up about 70% of a five by five inch ad, using up all the space other than a banner at the top, and leaving no room to persuade voters about anything. David Decl. ¶ 16; Ex. 3.

Even for longer five by ten inch ads, the City's demanded disclosure and disclaimer "is unduly burdensome," as it "drown[s] out" the Committee's message. *Am. Bev. Ass'n v. City & Cty. of S.F.*, 916 F.3d 749, 761 (9th Cir. 2019) (Ikuta, J., concurring); *id*. at 757 (en banc). The disclaimer and disclosure requirements consume about 35% of even the Committee's longer newspaper ads. David Decl. ¶ 17. And the requirements would take up about 23% of the front face of an 8.5 by 11 inch mailer. *Id*. ¶ 18.

Thus, San Francisco cannot seek refuge for its disclaimer and on-communication disclosure requirements under previous decisions upholding disclaimers and disclosure. When San Francisco's requirements consume 23-35% of even the

Committee's longer communications, and the requirements swallow entirely the Committee's shorter communications, the City cannot claim that its requirements "'impose no ceiling on campaign-related activities,' [or that its requirements] 'do not prevent anyone from speaking'." *Citizens United*, 558 U.S. at 366 (citations omitted). Like the expenditure limits at issue in *Buckley*, San Francisco's requirements "necessarily reduce[ ] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *McCutcheon*, 572 U.S. at 197 (alteration in original). And, because "political speech must prevail against laws that would suppress it, whether by design or inadvertence," *Citizens United*, 558 U.S. at 340, San Francisco's restrictions are unconstitutional. Like the expenditure limits at issue in *Buckley*, they are not narrowly tailored to promoting a compelling interest. In particular, limiting speech fails to further any interest in informing the public.

But even if exacting scrutiny were applied, San Francisco's laws would be unconstitutional. Exacting scrutiny is at least equal to, if not a higher standard than the intermediate scrutiny applied, for example, to commercial speech. *Compare AFPF*, 141 S. Ct. at 2383 (requiring a substantial relation to an important governmental interest and narrow tailoring), *with Am. Bev. Ass'n*, 916 F.3d at 755-56 (discussing *Zauderer* test). And the Ninth Circuit has already held that a less burdensome law was unconstitutional under the lesser scrutiny for commercial speech.

In *American Beverage Association*, the Ninth Circuit sitting en banc addressed San Francisco's demand that advertisements for sugar-sweetened beverages carry a health warning. 916 F.3d at 753. Applying the *Zauderer* test for "compelled commercial speech," the Ninth Circuit examined whether San Francisco's disclosure requirement was "unduly burdensome." *Id*. at 756. And, as with all heightened scrutiny, the City had the burden of proof: It had to demonstrate that its law was "neither unjustified nor unduly burdensome." *Id*. The en banc court concluded that a disclosure requirement taking only 20% of the speaker's message was "not justified when

1  balanced against its likely burden on protected speech." *Id*. at 757. But the burden

2  imposed in *American Beverage Association*, taking up 20% of the message, was smaller

3  than the *least* burdensome requirement that the City now imposes on the Committee's

4  speech. No less than in *American Beverage Association*, the City's requirements act to

5  "'drown[] out' Plaintiffs' messages and 'effectively rule[] out the possibility of having

6  [an advertisement] in the first place.'" *Id*. (alterations in original).

7      Whatever the level of scrutiny, San Francisco's burdens on political speech—

8  drowning out or preventing messages entirely—are unconstitutional as applied to the

9  Committee's speech. And they are likewise unconstitutional as applied to any other

10  ads where the City swallows more than 20% of a message, as the disclosure always

11  drowns out such messages.

12      E.  San Francisco's compelled messaging violates Plaintiffs' freedom of association

13      In driving away potential donors, San Francisco's on-communication secondary

14  donor disclosure requirements force the Plaintiffs and others to give up their First

15  Amendment right to freely associate with others, preventing them from strengthening

16  their voices and sharing their messages. The Supreme Court has long held that "the

17  right of association is a basic constitutional freedom that is closely allied to freedom of

18  speech and a right which, like free speech, lies at the foundation of a free society." *Fed.*

19  *Election Comm'n v. Nat'l Right to Work Comm.*, 459 U.S. 197, 206-07 (1982) (citation

20  and quotation marks omitted). "Protected association furthers a wide variety of

21  political, social, economic, educational, religious, and cultural ends, and is especially

22  important in preserving political and cultural diversity and in shielding dissident

23  expression from suppression by the majority." *AFPF*, 141 S. Ct. at 2382 (quotation

24  marks omitted). In particular, "compelled disclosure of affiliation with groups engaged

25  in advocacy may constitute as effective a restraint on freedom of association as [other]

26  forms of governmental action." *Id*. (quotation marks omitted).

27      As discussed above, Ed Lee Dems has donors who would be upset to have their

28  names listed on communications advocating positions in which they have no interest

1  or that they oppose. Cheng Decl. ¶ 9. They would withdraw their funding, making it

2  harder for the organization to pursue its many other goals. *Id.*

3     Furthermore, the disclaimer and disclosure requirements mislead the voters in a

4  way that would undermine the organization's goals. For example, San Francisco's

5  rules would require that David Chiu for Assembly 2022 be listed as a secondary donor

6  on the communications. But Mr. Chiu is a defendant to this lawsuit as the City

7  Attorney. He is not running for Assembly, nor is he inappropriately taking positions

8  on issues. But listing him and that committee on communications here would lead

9  voters to think otherwise, harming his reputation. And, as supporting leaders like Mr.

10 Chiu is part of the mission for Ed Lee Dems, the organization cannot associate with

11 SPB and support its communications.

12    The City's requirements thus violate Plaintiffs' freedom of association while

13 misleading rather than informing voters. The requirements do not serve the

14 informational interest and are unconstitutional.

15 II.  THE CHALLENGED PROVISIONS IRREPARABLY HARM PLAINTIFFS.

16    "Irreparable harm is relatively easy to establish in a First Amendment case," as a

17 party need only "demonstrate[] the existence of a colorable First Amendment claim."

18 *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019)

19 (quotation marks omitted). That is because "[t]he loss of First Amendment freedoms,

20 for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod

21 v. Burns*, 427 U.S. 347, 373 (1976); *accord CTIA*, 928 F.3d at 851. "When, as here, a

22 party seeks to engage in political speech in an impending election, a delay of even a

23 day or two may be intolerable." *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698

24 F.3d 741, 748 (9th Cir. 2012) (quotation marks omitted).

25    Plaintiffs have demonstrated irreparable harm: Until San Francisco's restrictions

26 are enjoined, the Committee cannot share its chosen messages, and Ed Lee Dems will

27 not be able to contribute to and associate with committees when that might risk on-

28 communication disclosure of its donors. Furthermore, as long as San Francisco's

24
Motion for Temporary Restraining Order (No. 3:22-cv-02785)

1   compelled speech requirements are in place, Mr. David and his committee's will be

2   restricted from speaking in future elections. David Decl. ¶ 25. And they and Ed Lee

3   Dems will continue to be limited in their ability to associate with and support the

4   messages of other committees. David Decl. ¶ 8; Cheng Decl. ¶ 11.

5   III.   THE BALANCE OF EQUITIES, AND THE PUBLIC INTEREST, FAVOR PLAINTIFFS.

6        "Courts have consistently recognized the significant public interest in upholding

7   First Amendment principles." *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 2021

8   U.S. App. LEXIS 35760, at *29 (9th Cir. 2021). Thus, where it is likely that the First

9   Amendment has been violated, an "injunction serves the interests of the general public

10  by ensuring that the government's [actions] comply with the Constitution . . . because

11  all citizens have a stake in upholding the Constitution." *Hernandez v. Sessions*, 872

12  F.3d 976, 996 (9th Cir. 2017) (quotation marks omitted); *see also Rodriguez v. Robbins*,

13  715 F.3d 1127, 1145 (9th Cir. 2013) (noting that the government "cannot suffer harm

14  from an injunction that merely ends an unlawful" or unconstitutional practice).

15  Accordingly, "[t]he public interest and the balance of the equities favor preventing the

16  violation of [Plaintiffs] constitutional rights." *Ariz. Dream Act Coal. v. Brewer*, 855

17  F.3d 957, 978 (9th Cir. 2017) (quotation marks omitted).

18                                   CONCLUSION

19       Plaintiffs' motion for temporary restraining order and for a preliminary

20  injunction should be granted.

21  Dated: May 12, 2022                    Respectfully submitted,

22  */s/ Nicholas Sanders*                 */s/ Owen Yeates*
    Nicholas Sanders (SBN 307,402)         Owen Yeates (pro hac vice)
23  James R. Sutton (SBN 135,930)          Alan Gura (SBN 178221)
    THE SUTTON LAW FIRM                    INSTITUTE FOR FREE SPEECH
24  150 Post St. Ste. 405                  1150 Connecticut Ave., NW, Ste. 801
    San Francisco, CA 94108                Washington, DC 20036
25  Tel.: 415-732-7700                     Tel.: 202-301-3300
    jsutton@campaignlawyers.com            oyeates@ifs.org
26  nsanders@campaignlawyers.com           agura@ifs.org

27                                         *Counsel for Plaintiffs*

28

CERTIFICATE OF NOTICE

Pursuant to Rule 65(b)(1)(B), the undersigned contacted representatives for Defendants to ask whether they would accept service of the above Notice of Motion and Motion for Temporary Restraining Order and Preliminary Injunction.

I spoke with Andrew Shen, who is currently, or has recently been, the Deputy City Attorney assigned as counsel for the San Francisco Ethics Commission (the "Commission") at the City Attorney's office, on May 10, 2022, and Mr. Shen said that he was working to consolidate service into one litigator at the City's Attorney's office. On May 11, 2022, Mr. Shen told me that Deputy City Attorney Tara Steeley would be handling the case and would have the authority to accept service on behalf of all defendants.

Ms. Steeley and I spoke on May 11, 2022. From that call, I understood that she would be accepting service for all defendants. I emailed Ms. Steeley a summary of my understanding of the conversation, and she responded that she would accept service of summons for Defendants David Chiu and the City and County of San Francisco, but that she could not accept service for Defendant Chesa Boudin and Defendant Commission.

After the email from Ms. Steeley, I again called Mr. Shen. Because of Mr. Shen's assignment to the Commission, I understand that he is most likely to have the authority to accept service on behalf of the Commission. I left a voicemail asking whether Mr. Shen or someone else in the City Attorney's office would represent the Commission and accept service. Mr. Shen has not yet responded.

I also contacted the Commission to speak with either Executive Director LeeAnn Pelham or Chief of Enforcement Pat Ford. I was directed to Mr. Ford with an indication that he could handle all inquiries about service. Mr. Ford did not answer his phone, and I left a voicemail asking who would accept service on the Commission's behalf. Mr. Ford responded by email on May 12, 2022, that the City Attorney's office handles litigation against the City and that Plaintiffs should contact Ms. Steeley and

Mr. Shen.

Defendant Chesa Boudin is represented by counsel for Plaintiffs in other matters, and we regularly communicate. After Ms. Steeley's refusal to accept service for Mr. Boudin, I spoke with Mr. Boudin by phone to ask who would accept service in the District Attorney's office of the above Motion. Mr. Boudin indicated that the City Attorney should accept service on behalf of him and his office, and indicated that he would call the City Attorney assigned to the District Attorney's office to discuss service at his earliest convenience. Mr. Boudin has not yet been able to provide me with any additional information.

Because the City Attorney's office seems to be the only entity which can accept service for Mr. Boudin and the Commission, I called Ms. Steeley again on May 12, 2022. Ms. Steeley did not answer her phone, and I left a voicemail asking whether she might reconsider accepting service on behalf of all defendants to avoid having three separate Deputy City Attorneys handling service. Ms. Steeley has not yet responded.

We have sent the Complaint and Motion for Temporary Restraining order, along with their accompanying documents, to Ms. Steeley, for Defendants Chiu and San Francisco. We have also sent them to the main email address at the District Attorney's office, districtattorney@sfgov.org, and to the main email address for the San Francisco Ethics Commission, ethics.commission@sfgov.org.

All the Defendants know that the lawsuit has been filed, and copies of the Complaint and Motion have been sent to all Defendants. All Defendants have adequate notice of the Complaint and Motion, and the only point of contention is who will accept official service. Further notice of the Motion should not be required.

Dated: May 12, 2022

/s/ Nicholas Sanders
Nicholas Sanders (SBN 307,402)
*Counsel for Plaintiff*

1          CERTIFICATE OF SERVICE

2          I hereby certify that I served a true and correct copy of the foregoing by emailing it

3     to the following:

4     Tara Steeley
      Office of City Attorney David Chiu
5     City Hall, Room 234
      1 Dr. Carlton B. Goodlett Pl.
6     San Francisco, CA 94102
      tara.steeley@sfcityatty.org
7
      *Counsel for Defendant David Chiu and*
8     *City and Defendant City and County of*
      *San Francisco*
9
      Chesa Boudin
10    350 Rhode Island Street
      North Building, Ste. 400N
11    San Francisco, CA 94103
      districtattorney@sfgov.org
12
      San Francisco Ethics Commission
13    25 Van Ness Ave., Ste. 220
      San Francisco, CA 94102
14    ethics.commission@sfgov.org

15    Andrew Shen
      Office of City Attorney David Chiu
16    City Hall, Room 234
      1 Dr. Carlton B. Goodlett Pl.
17    San Francisco, CA 94102
      andrew.shen@sfcityatty.org
18
      *Sometimes assigned as counsel for the*
19    *San Francisco Ethics Commission*

20    Dated: May 12, 2022                    /s/ *Owen Yeates*
21                                           Owen Yeates (pro hac vice)
                                             Institute for Free Speech
22                                           1150 Connecticut Ave., NW, Ste. 801
                                             Washington, DC 20036
23                                           oyeates@ifs.org
                                             Tel.: 202-301-3300
24
                                             *Counsel for Plaintiff*
25

26

27

28